Filed 4/4/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DANGER PANDA, LLC etc.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>NANCY ANN LAUNIU et al.,<br><br>    Defendants and Respondents. | A149062<br><br>(San Francisco City & County<br>Super. Ct. No. CUD-15-652161) |

**I. INTRODUCTION**

Danger Panda, LLC (plaintiff) filed this unlawful detainer action against Nancy Launiu, Nancy's adult son Donn, and Donn's wife Olga (collectively, defendants).[1] Plaintiff alleged the defendants have refused to vacate a unit in a building that plaintiff withdrew from residential rental use pursuant the Ellis Act.  (Gov. Code, § 7060 et seq.) The trial court granted defendants' motion to quash the unlawful detainer complaint, finding that plaintiff failed to tender a relocation payment to Donn and Olga's minor son David, as required by section 37.9A, subdivision (e) (section 37.9A(e)) of the San Francisco Residential Rent Stabilization and Arbitration Ordinance, San Francisco Administrative Code, chapter 37 (the Rent Ordinance).[2]

The appellate division of the superior court affirmed the trial court's order, but then certified the matter for transfer to the Court of Appeal to settle the following question of law: "whether a minor displaced by an Ellis Act eviction is a 'tenant' under the San Francisco Rent Ordinance and, therefore, entitled to a relocation payment

---

[1]  We will use given names to distinguish between members of the Launiu family.

[2]  All subsequent unspecified section references are to the Rent Ordinance.

1

pursuant to section 37.9A(e)(3)(A) of the San Francisco Rent Ordinance." We accepted transfer of this case and now hold that a minor is not a tenant under the Rent Ordinance provisions that pertain to Ellis Act evictions.

## II. STATUTORY OVERVIEW

### A. Two Statutory Schemes

In 1979, the San Francisco Board of Supervisors enacted the Rent Ordinance " 'because the lack of affordable rental housing in San Francisco was creating hardships on senior citizens, persons on fixed incomes, and low- and moderate-income households. [¶] When adopting the Rent Ordinance, the Supervisors created a five-member Rent Board charged with safeguarding tenants from excessive rent increases, while also assuring landlords fair and adequate rents consistent with federal anti-inflation guidelines. . . . The Supervisors conferred on the Rent Board a range of powers and duties, including the power to "Promulgate policies, rules and regulations to effectuate the purposes of this Chapter." (Rent [Ordinance], § 37.6, subd. (a).) The purposes of the Rent Ordinance included, among others, the limitation of rent increases for tenants in occupancy (Rent [Ordinance], § 37.3), the arbitration of rental increase adjustments (Rent [Ordinance], §§ 37.8-37.8B), and the restriction of the grounds on which landlords could evict tenants from their rental units (Rent [Ordinance], §§ 37.9–37.9B).' [Citation.]" (*Foster v. Britton* (2015) 242 Cal.App.4th 920, 925.) To achieve this last purpose, the Rent Ordinance delineates discrete circumstances under which a landlord may "endeavor to recover possession of a rental unit." (Rent Ordinance, § 37.9, subd. (a).)

In 1985, the California Legislature passed the Ellis Act, which provides that no public entity may "compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease, except for [certain] guestrooms or efficiency units within a residential hotel . . . ." (Gov. Code, § 7060, subd. (a).)

"The Legislature enacted the Ellis Act following the California Supreme Court's opinion in *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97 . . . , upholding a city ordinance that required owners of residential rental property to obtain a permit before

2

they could remove property from the rental market.  [Citation.]  '[T]he Act was intended to overrule the *Nash* decision so as to permit landlords the unfettered right to remove all residential rental units from the market, consistent, of course, with guidelines as set forth in the Act and adopted by local governments in accordance thereto.'  [Citations.]" (*Johnson v. City and County of San Francisco* (2006) 137 Cal.App.4th 7, 12-13 (*Johnson*).)

In May 1986, following the passage of the Ellis Act, the Rent Ordinance was amended to add section 37.9, subdivision (a), subsection (13) (section 37.9(a)(13)), which recognizes a landlord's right to withdraw a residential unit from the rental market.  (Ord. No. 193-86, File No. 109863 (May 19, 1986), p. 8.)  In its current form, section 37.9(a)(13) states in pertinent part: "(a) A landlord shall not endeavor to recover possession of a rental unit unless: [¶] . . . (13) The landlord wishes to withdraw from rent or lease all rental units within any detached physical structure and, in addition, in the case of any detached physical structure containing three or fewer rental units, any other rental units on the same lot, and complies in full with Section 37.9A with respect to each such unit, provided, however, that guestrooms or efficiency units within a residential hotel" are subject to different rules.[3]  (Rent Ordinance, § 37.9(a)(13).)

Section 37.9A of the Rent Ordinance was enacted at the same time as section 37.9(a)(13) in order to confer rights on certain tenants displaced by the Ellis Act.  (Ord. No. 193-86, File No. 109863, *supra*, pp. 10-19.)  In its current form, section 37.9A(e) requires owners of residential rental properties who seek to withdraw from the rental market pursuant to the Ellis Act to provide monetary relocation assistance to their tenants.

There is no dispute in this case that the board of supervisors has the authority to require landlords to provide financial relocation assistance to tenants displaced by an Ellis Act eviction under Government Code section 7060.1, subdivision (c), which states: "Notwithstanding Section 7060, nothing in this chapter does any of the following: . . .

---

[3] This case does not involve a residential hotel.

3

(c) Diminishes or enhances any power in any public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations." (See generally *Pieri v. City and County of San Francisco* (2006) 137 Cal.App.4th 886 (*Pieri*).) The present appeal arises out of a dispute about who is entitled to receive a relocation assistance payment under Rent Ordinance, section 37.9A(e).

**B. Relocation Assistance for Ellis Act Evictions**

The nature and scope of the relocation assistance benefit conferred by section 37.9A has evolved over time pursuant to multiple Rent Ordinance amendments, of which we highlight only a few. As originally enacted, subdivision (f) of section 37.9A (former section 37.9A(f)) provided that the "tenants of any rental unit" who were evicted under section 37.9(a)(13) were entitled to payment of a fixed sum before they vacated the unit. (Ord. No. 193-86, File No. 109863, *supra*, p. 14.) The amount of the payment the landlord was required to make depended on the size of the rental unit, although units with elderly or disabled renters were entitled to a higher payment. (*Ibid*.)

In September 1994, the board of supervisors approved an amendment to former section 37.9A(f) that limited "payment of relocation assistance to tenants in lower income households." (Ord. No. 320-94, File No. 979413 (Sept. 7, 1994), p. 1, capitalization omitted.) Payments under this version of former section 37.9A(f) were expressly referred to as "relocation payments" and were expressly limited to "tenants who are members of lower income households, who are elderly, or who are disabled . . . ." (*Id*. at p. 5.) An elderly or disabled tenant was entitled to a higher fixed payment. Payments that were due for a unit that was occupied by more than one tenant were to "be divided equally among all the occupying tenants, excluding those tenants" who were entitled to separate payments due to their elderly or disabled status. (*Id*. at pp. 6-7.)

In December 1999, the board of supervisors passed an ordinance that increased "the amount of relocation payments made by landlords to low-income tenants evicted pursuant to the Ellis Act . . . ." (Ord. No. 5-00, File No. 992236 (Dec. 20, 1999), p. 1, capitalization omitted.) Pertinent provisions were amended to provide that "Tenants who are members of lower income households . . . and who receive a notice to quit based upon

4

Section 37.9(a)(13), in addition to all rights under any other provisions of law, shall be entitled to receive $4,500 before vacating the premises." (*Id*. at p. 5.) As before, landlords were required to make separate fixed payments to elderly or disabled tenants. This version of the relocation assistance benefit required that payments due "for any unit which is occupied by more than one tenant shall be divided equally among all the occupying tenants excluding those tenants" who were separately entitled to payments because of their elderly or disabled status. (*Id*. at p. 5.)[4]

In December 2004, the board of supervisors amended section 39.9A to eliminate the limitation restricting payment of relocation assistance to low income, elderly and disabled tenants. (Ord. No. 21-05, File No. 041151 (Dec. 14, 2004), p. 15.)[5] For Ellis Act evictions commenced after the effective date of these amendments (February 20, 2005), relocation payments were required to be paid in accordance with section 37.9A(e) subsection (3) (section 37.9A(e)(3)), the terms of which are at issue in this appeal. (*Id*. at p. 17; see also Rent Ordinance, § 37.9A(e)(3).)

Under section 37.9A(e)(3), "each tenant shall be entitled to receive $4,500.00, one-half of which shall be paid at the time of the service of the notice of termination of tenancy, and one-half of which shall be paid when the tenant vacates the unit." (Rent Ordinance, § 37.9A(e)(3)(A).) However, if there are "more than three tenants in a unit,

---

[4] The December 1999 amendment increasing the amount of the relocation payments was accompanied by a set of findings, which included the following: (1) tenants evicted under the Ellis Act are "forced to incur substantial costs to relocate themselves and their families to new housing"; (2) costs incurred to relocate often include payment for temporary housing and lost work time to seek new housing; (3) anticipated costs of the household include new apartment move in costs, the actual cost of a mover, and reestablishing various utilities; and (4) tenants without funds to move face a severe risk of homelessness. (Ord. 5-00, File No. 992236, pp. 9-10.)

[5] In *Pieri*, *supra*, 137 Cal.App.4th 886, this court rejected the contention that Government Code section 7060.1 of the Ellis Act restricts the authority of public entities to require mitigation only for low income residents, and concluded that provisions of the Rent Ordinance requiring relocation assistance regardless of income did not offend the purposes of the Ellis Act by " 'prevent[ing] all but the wealthiest landlords from going out of the rental business.' " (*Pieri*, at p. 889.)

the total relocation payment shall be $13,500.00, which shall be divided equally by the number of tenants in the unit." (Rent Ordinance, § 37.9A(e)(3)(B).) Tenants over the age of 62 or who are disabled "shall be entitled to receive an additional payment of $3,000, $1,500.00 of which shall be paid within fifteen (15) calendar days of the landlord's receipt of written notice from the tenant of entitlement to the relocation payment, and $1,500 of which shall be paid when the tenant vacates the unit." (Rent Ordinance, § 37.9A(e)(3)(C).) The amounts of the relocation payments specified in these provisions are adjusted annually to comport with the "Consumer Price Index (CPI) for All Urban Consumers in the San Francisco-Oakland-San Jose Region for the preceding calendar year." (Rent Ordinance, § 37.9A(e)(3)(D).)[6]

### III. FACTUAL AND PROCEDURAL BACKGROUND

#### A. The Complaint

In April 2015, plaintiff filed a wrongful detainer complaint against defendants in which it alleged the following facts:

Plaintiff owns a building on Bartlett Street which includes "Unit 308A," a residential unit. Defendants and Donn and Olga's minor son David occupy Unit 308A pursuant to a 1971 rental agreement between Nancy and plaintiff's predecessor-in-interest. On March 26, 2014, plaintiff served defendants and David with a "Notice of Termination of Tenancy" advising them of plaintiff's intention to withdraw the Bartlett building from residential rental use under the Ellis Act and section 37.9(a)(13) of the Rent Ordinance. Plaintiff also sent each defendant a check for $2,632.55, which was characterized as the first half of their "statutorily required relocation assistance"

---

[6] For Ellis Act evictions commenced after June 1, 2014, section 37.9A(e)(3)(E) establishes an alternative formula for calculating relocation payments, which is based on a "Rental Payment Differential," and further provides that the tenant is entitled to a payment under whichever formula provides a greater amount. (Rent Ordinance, § 37.9A(e)(3)(E).) Neither party contends that section 37.9A(e)(3)(E) applies in this case.

6

payment.[7]  On March 27, plaintiff submitted a "Notice of Intent to Withdraw Residential Units from the Rental Market" to the Rent Board, and it subsequently served defendants with copies of that notice.  In a letter dated April 4, 2014, Nancy informed plaintiff that she was entitled to a one-year extension of the withdrawal of Unit 308A from the rental market due to her senior status.[8]  On April 10, plaintiff sent letters to Nancy and the Rent Board recognizing that Nancy's extension claim was valid and stating that Unit 308A would not be withdrawn from the rental market until March 27, 2015.  Plaintiff also sent Nancy a check for $1,755.03, as payment of the first half of the additional relocation payment Nancy was owed due to her senior status.  However, on March 27, 2015, and thereafter, defendants and David failed to vacate Unit 308A.

Relying on these general allegations, plaintiff alleged that it complied with all lawful provisions of the Ellis Act and the Rent Ordinance, and was therefore entitled to recover possession of its property from defendants and to damages for the fair market rental value of the premises.  After plaintiff made multiple attempts to serve defendants personally with the summons and unlawful detainer complaint, the court authorized service by posting and mailing.

## B.  The Motion to Quash

On May 20, 2015, defendants filed a motion to quash service of the summons and wrongful detainer complaint.  Among other things, defendants argued that plaintiff did not comply with section 37.9A(e)(3) of the Rent Ordinance because it failed to provide

---

[7] If these three payments are added together and multiplied by two, the total amount exceeds the $13,500 cap established by Rent Ordinance, section 37.9A(e)(3)(B). It appears that the additional amount is consistent with the CPI adjustment authorized under section 37.9A(e)(3)(D).

[8] For Ellis Act evictions commenced on or after January 1, 2000, the date of withdrawal from the rental market is 120 days from delivery of the landlord's notice of intent to withdraw. (Rent Ordinance, § 37.9A, subd. (f)(4).)  However, upon proper notice, the date of the withdrawal shall be extended for an additional year "if the tenant or lessee is at least 62 years of age or disabled . . . ." (*Ibid.*)  The notice requirements attendant to Ellis Act evictions are not at issue in this appeal.

7

David with a separate relocation payment, notwithstanding the fact that he was a "tenant" under the Rent Ordinance.[9]

Opposing the motion to quash, plaintiff argued that it met its relocation payment obligations to the tenants in Unit 308A by paying the maximum payment required by the Rent Ordinance and dividing that amount among the three adult occupants of Unit 308A. Plaintiff explained that David "was not issued his own personal check as he is not an adult able to contract with Plaintiff to occupy the Premise." Thus, plaintiff took the view that David was not a "tenant" under the Rent Ordinance. Plaintiff further argued that if it had provided David his own separate payment, the amounts paid to Nancy (the non-parent) and Donn and Olga "would have been unlawfully and improperly decreased, as they would not have received their proper pro rata shares." Thus, plaintiff maintained that it complied with section 37.9A(e)(3) of the Rent Ordinance by "paying the full amount of relocation [payment] to the tenants," and once "the family" received that maximum payment, they were free to divide the funds as they saw fit.

### C. Superior Court Orders

On June 1, 2015, the trial court granted defendants' motion to quash service of the summons and unlawful detainer complaint. In a brief order filed that day, the court found: "Plaintiff failed to tender a statutory relocation payment to defendants' minor child David Launiu pursuant to Rent Ordinance § 37.9A(e)(3)(A), who was named in the Notice of Termination of Tenancy and has a right to occupy the premises with his parents/grandmother. This lowered the sum parents & minor child would have received in total."

On July 15, 2016, the appellate division of the superior court filed an order affirming the superior court's ruling. The court clarified that the dispute was not about whether plaintiff paid the correct total amount under the Ellis Act, but rather whether the

---

[9] "A tenant facing an unlawful detainer action under the Ellis Act may assert as a defense that his or her landlord failed to comply with the provisions of the Act or any statutes, ordinances, or regulations adopted pursuant to the Act. ([Gov. Code,] § 7060.6.)" (*Johnson*, *supra*, 137 Cal.App.4th at p. 13.)

amount was properly allocated among the tenants. The court found that the amount was not properly allocated for the following reasons: (1) David was a tenant because he was "entitled to occupy the premises"; (2) David's status as a minor did not preclude him from receiving a check; and (3) if plaintiff had "properly divided the relocation payments in to [*sic*] four checks, David and his parents would have received an additional $650."[10] The appellate panel rejected plaintiff's contention that, even if the payments were not properly allocated, plaintiff substantially complied with the Ellis Act. According to the court, "since the relocation payments and the definition of a tenant owed those payments are expressly stated in the Ellis Act, the section must be strictly complied with."

The appellate panel also rejected plaintiff's contention that the motion to quash was barred by equitable estoppel. Plaintiff had argued that defendants were estopped to contest the allocation of the relocation payment because they accepted plaintiff's checks without objection, and if they had informed plaintiff of the issue regarding David's status, plaintiff could have sent new checks long before the unlawful detainer complaint was filed. In rejecting this equitable claim, the appellate panel found that the Ellis Act does not impose any obligation on defendants to raise this issue with plaintiff, and that there was insufficient evidence that defendants "deposited the checks and intentionally remained silent as to the relocation payments."

## IV. DISCUSSION

### A. Issue Presented

The question presented to this court is whether a minor displaced by an Ellis Act eviction is a tenant entitled to a relocation payment under section 37.9A(e)(3) of the Rent Ordinance. "[O]ur task ' "is to determine the intent of the enacting body so that the law

---

[10] Apparently the appellate panel below assumed that Donn, Olga and David are a single family unit that is easily distinguishable from Nancy. Thus, the court reasoned that if the total relocation payment was divided among all four occupants of the unit rather than the three adults, the total payment to the family would have been $650 higher, and the net payment to Nancy concomitantly lower. Plaintiff and amicus curie, San Francisco Apartment Association, point out the logistical problems of requiring landlords to make this type of assumption about the composition of a family unit.

9

may receive the interpretation that best effectuates that intent. [Citation.]" ' [Citation.] We begin by examining the words of the statute because the ' " 'language is generally the most reliable indicator of legislative intent. [Citation.]' " ' [Citation.] The statutory language is not read in isolation, however. Rather, we consider its terms 'in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' [Citation.]" (*Los Angeles Unified School Dist. v. Garcia* (2013) 58 Cal.4th 175, 186; see also *Danekas v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2001) 95 Cal.App.4th 638, 645.)

As noted above, the appellate panel concluded that "since the relocation payments and the definition of a tenant owed those payments are expressly stated in the Ellis Act, the section must be strictly complied with." The premise of this statement is erroneous.[11] The Ellis Act does not expressly address relocation payments or define the term "tenant." However, as noted above, the Ellis Act does recognize a public entity's authority to mitigate the adverse impact on "persons" displaced by an Ellis Act eviction. (Gov. Code, § 7060.1, subd. (c).) Thus, we turn to the Rent Ordinance provisions to determine what persons displaced by an Ellis Act eviction are entitled to a relocation payment benefit.

**B. The Rent Ordinance Definition of a Tenant**

As reflected in our statutory overview, section 37.9A(e)(3) provides that "each tenant" displaced under section 37.9(a)(13) "shall be entitled" to a relocation payment. Although the Rent Ordinance contains a set of definitions to be used for "purposes" of applying section 37.9A, the term "tenant" is not defined there. (Rent Ordinance, § 37.9A(e)(3)(E)(vi).)

However, the general "Definitions" section of the Rent Ordinance contains the following definition: "**Tenant**. A person entitled by written or oral agreement, sub-

---

[11] The parties seek review of the appellate panel's conclusion that strict compliance with the Ellis Act is required. But that issue is outside the scope of the transfer order.

10

tenancy approved by the landlord, or by sufferance, to occupy a residential dwelling unit to the exclusion of others." (Rent Ordinance, § 37.2, subd. (t) (section 37.2(t)), original boldface.) This definition has remained unchanged since 1980 (Ord. No. 197-80, File No. 109801.2 (May 5, 1980), p. 4), although its alphabetical subdivision designation has changed several times.

The parties disagree about whether David fits within the Rent Ordinance's general definition of a tenant. Construing section 37.2(t) according to its plain language, a tenant is a person who is entitled to occupy a residential unit (1) to the exclusion of all others and (2) pursuant to a written agreement; oral agreement; sub tenancy approved by the landlord; or sufferance.

The first of these requirements, the right to occupy to the exclusion of others, is a key characteristic of a leasehold, which distinguishes a tenancy from a mere license. (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1040.) Payment of rent is the consideration for this right to exclusive possession. (*Avalon Pacific—Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1190 ["A lease is both a conveyance of an estate in real property and a contract between the lessor and the lessee for the possession and use of the property in consideration of rent."]; see also 12 Witkin Summary of Cal. Law (10th ed. 2005) Real Property, § 517, p. 593.) Thus, an occupant of a rental unit who does not have the right to exclusive possession and the concomitant obligation to pay rent does not meet the generally accepted common law definition of a tenant. Nor does he or she fall within the section 37.2(t) definition of a tenant quoted above.

In the present case, the complaint alleged that Unit 308A is occupied pursuant to a written lease agreement. That agreement, which was incorporated into the complaint, was executed between plaintiff's predecessor in interest and Nancy and her husband. Therefore, Nancy is a tenant under section 37.2(t). Furthermore, by alleging that Donn and Olga are also tenants of Unit 308A, plaintiff appears to have conceded that these defendants acquired an independent right to occupy the premises to the exclusion of others, pursuant to either a written lease, oral contract, sub tenancy or suffrage.

11

However, David is a minor without capacity to enter into a rental contract or to incur an independent obligation to pay rent. (Fam. Code § 6701 ["A minor cannot do any of the following: . . . (b) Make a contract relating to real property or any interest therein."].) Thus, he could not have acquired a legally cognizable right to occupy Unit 308A to the exclusion of others pursuant to any of the methods set forth in section 37.2(t). This does not mean that David is not a lawful occupant, but only that his right to occupy is derivative of the rights of his parents. (See, e.g., *Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1551 [minor child of tenant has the "right to enjoyment of the premises as a member of the tenant['s] family"].)

Defendants argue that the complaint allegation acknowledging that David occupies Unit 308A pursuant to Nancy's written lease agreement establishes that David "is a tenant under the Rent Ordinance because he is a lawful occupant of the premises." The lower courts reached similar conclusions. Without discussion, the trial court found that David is entitled to a relocation payment because he "has a right to occupy the premises with his parents/grandmother." The appellate panel also found that "the definition in section 37.2(t) clearly states that a person is a tenant so long as they are entitled to occupy the premises." In fact, though, section 37.2(t) does not state that every lawful occupant of the premises is a tenant, but rather that a tenant is a lawful occupant who acquired the right to exclusive occupancy in one of the specified ways.

Considering the Rent Ordinance as a whole reinforces the conclusion that "lawful occupant" and "tenant" are not interchangeable terms. According to plaintiff's calculations, the Rent Ordinance uses the word "occupants" about 40 times and the word "tenant" hundreds of times. For our purposes, we focus on three examples.

First, as previously noted, section 37.9(a) restricts the grounds for evicting a tenant by specifying when a landlord may endeavor to recover a rental unit. One proper ground for pursuing an eviction is when the tenant has violated a lawful obligation or covenant of the tenancy. (Rent Ordinance, § 37.9(a)(2).) However, there are several qualifications for pursuing this type of eviction, depending on the nature of the covenant at issue. For example, when a rental agreement "limits the number of occupants or limits or prohibits

12

subletting or assignment," section 37.9(a)(2)(B) provides that "a landlord shall not endeavor to recover possession of a rental unit as a result of the addition to the unit of a tenant's child, parent, grandchild, grandparent, brother or sister, or the spouse or domestic partner . . . of such relatives, or as a result of the addition of the spouse or domestic partner of a tenant, so long as the maximum number of occupants [authorized by the Rent Ordinance] is not exceeded, if the landlord has unreasonably refused a written request by the tenant to add such occupant(s) to the unit." Section 37.9(a)(2)(B) further provides that "[a] landlord's reasonable refusal of the tenant's written request may not be based on the proposed additional occupant's lack of creditworthiness, if that person will not be legally obligated to pay some or all of the rent to the landlord. . . ."

Thus, section 37.9(a)(2)(B) prohibits a landlord from unreasonably refusing to add family members as "occupants," and also acknowledges that a person who will not be legally obligated to pay rent may nevertheless lawfully occupy the unit. By using the word occupant in these contexts, the Rent Ordinance affords protections to inhabitants whether or not they fall within the formal definition of a tenant set forth in section 37.2(t).

A second example that the Rent Ordinance distinguishes between legal occupants and tenants is found in section 37.3, which regulates rent increases. Section 37.3, subdivision (a)(11)(A) provides that, with exceptions, "a landlord may not impose increases solely because a tenant has added an additional occupant to an existing tenancy, including, but not limited to, a newborn child or family member as defined in Section 401 of the Housing Code. The prohibition on increases mandated by this Subsection (A) shall apply notwithstanding a rental agreement or lease that specifically permits a rent increase [f]or additional occupants."

By describing newborn children and new family members of the tenant as occupants rather than tenants in their own right, section 37.3, subdivision (a)(11)(A) is another example of the fact that, while the Rent Ordinance provides protections to all legal occupants of a rental unit, all such occupants are not tenants as that term is defined in section 37.2(t).

13

Our final example of the fact that the Rent Ordinance distinguishes between a lawful occupant and a tenant is found in section 37.9C, which was added in 2006 to provide relocation assistance to tenants displaced by so-called "No-Fault" evictions that are not based on the Ellis Act. (Rent Ordinance, § 37.9C.) A set of definitions applicable only for purposes of determining entitlement to the section 37.9C benefit includes the following definition of an Eligible Tenant: "For purposes of this section 37.9C, an Eligible Tenant shall mean any authorized occupant of a rental unit, regardless of age, who has resided in the unit for 12 or more months." (Rent Ordinance, § 37.9C, subd. (a)(2).)

Section 37.9C, subdivision (b) provides that "Each Eligible Tenant who received a Covered No-Fault Eviction Notice, in addition to all rights under any other provision of law, shall be entitled to receive relocation expenses from the landlord, in the amounts specified in section 37.9C(e)." Under section 37.9C, subdivision (e)(1) each Eligible Tenant shall receive a payment of $4,500.00, with the caveat that the landlord shall not be required to pay more than $13,500.00 to Eligible Tenants in the same unit. Under section 37.9C, subdivision (e)(2), the landlord must make an additional payment to each Eligible Tenant who is over 60 or disabled and to "each household with at least one Eligible Tenant and at l[e]ast one child under the age of 18 years."

Section 37.9C is relevant to our analysis in two material ways. First, as noted, this part of the Rent Ordinance utilizes a special definition of an "Eligible Tenant" that includes all authorized occupants "regardless of age." (Rent Ordinance, § 37.9C subd. (a)(2).) This specially defined term would be superfluous if, as the lower courts found, section 37.2(t) includes within the definition of "tenant" all lawful occupants, even those without the right to exclusive occupancy and the concomitant obligation to pay rent, and those who lack the capacity to incur an obligation to pay rent because they are minors.

Second, in contrast to section 37.9C, section 37.9A does not contain a special definition of a tenant who is entitled to an Ellis Act relocation benefit. As our statutory overview reflects, this part of the Rent Ordinance has been amended several times,

14

sometimes to limit the scope of the benefit and other times to expand it. There are clear indications of a legislative goal to assist not just the displaced tenant, but the tenant's family or household. For example, the December 1999 amendment increased the amount of the relocation payments in recognition that tenants evicted under the Ellis Act are "forced to incur substantial costs to relocate themselves *and their families* to new housing . . . ." (Ord. No. 5-00, File No. 992236 (Dec. 20, 1999), p. 9, italics added.) However, we find no evidence of an intent to require a landlord to parse a relocation payment among individual members of such a household or to make a separate payment to a tenant's minor child. Thus, the history of section 37.9A is indicative of a legislative determination not to expand the scope of eligible recipients of an Ellis Act relocation benefit under section 37.9A beyond those tenants who fit the traditional common law definition of that term.

Furthermore, because section 37.9A does not contain a special definition of a tenant who is entitled to an Ellis Act relocation benefit, in order to qualify for that benefit, the occupant must be a tenant as defined in section 37.2(t), the more general section of the Rent Ordinance, which essentially means that he or she must be a tenant for all purposes for which the term tenant is employed throughout the Rent Ordinance. Characterizing a minor like David as a tenant for all purposes could lead to absurd results because the Rent Ordinance confers benefits and obligations on a tenant that should not and sometimes cannot be assumed by a child, not the least of which is the obligation to pay rent.

### C. Case Law

Defendants contend that the common law "is not determinative of this appeal, because the Rent Ordinance has specifically defined those who are tenants under the Ordinance in Section 37.2(t)." But defendants ignore language in section 37.2(t) that, as discussed above, is consistent with the traditional definition of a tenant.

Instead, defendants maintain that California courts have "repeatedly" interpreted the Rent Ordinance definition of a tenant to include "all lawful occupants of a dwelling." The cases defendants cite fall into two general categories, one addressing lawful

15

occupancy and the other addressing the rights of a minor child.  As discussed below, these cases are not directly on point, and, to the extent they are relevant, they reinforce the conclusions outlined above.

### 1. Lawful Occupancy

Defendants posit that the fact David cannot be a party to a lease agreement does not preclude him from qualifying as a tenant under the Rent Ordinance because case law establishes that a lawful occupant of a San Francisco rental unit can be a tenant entitled to Rent Ordinance protection even absent an agreement to pay rent.  (Citing *Parkmerced Co. v. San Francisco Rent Stabilization & Arbitration Bd.* (1989) 215 Cal.App.3d 490 (*Parkmerced*)).)

In *Parkmerced*, *supra*, 215 Cal.App.3d 490, Clarence Honey rented a San Francisco apartment pursuant to a 1976 lease agreement.  In 1981, Honey's sister, Margot Abenheim, moved into the apartment with Honey.  From 1981 until 1985, Honey renewed his lease annually and listed Abenheim's name on the renewal.  During this entire period, Abenheim used her own personal check to pay monthly rent for the apartment.  Then, in 1985, Honey moved out.  The landlord issued a new lease in Abenheim's name, informing her that she could remain in the apartment only if she agreed to a rent increase that was higher than the maximum amount of allowable rent the landlord could charge a continuing tenant protected by the Rent Ordinance.  (*Id.* at p. 492.)  The Rent Board found Abenheim was a tenant under the Ordinance's general definition of that term, and that the proposed rent increase was not authorized because it exceeded the lawful limits imposed by pertinent rent control provisions of the Ordinance.  The superior court disagreed with the Rent Board, finding that the new rental rate was authorized because Abenheim first became a tenant when she incurred the obligation to pay rent by signing her own lease agreement after Honey vacated the apartment.  (*Id.* at p. 494.)  However, the judgment was reversed on appeal.

The *Parkmerced* appellate court found that Abenheim was already a tenant protected by the rent increase limitations of the Ordinance when the landlord generated a new lease agreement purporting to raise Abenheim's rent after Honey moved out of the

16

apartment, explaining: "Since 1981 Parkmerced was aware of, and by its silence agreed to, Abenheim living in the apartment with her brother. Each year Honey submitted to Parkmerced an application for lease rental which listed Abenheim as an occupant of the apartment; pursuant to paragraph 25 of Parkmerced's lease these applications were incorporated into Honey's leases. Thus, because Abenheim was entitled to occupy the unit pursuant to a written agreement—Honey's leases—she falls squarely within the purview of section 37.2(r)."[12] (*Parkmerced*, *supra*, 215 Cal.App.3d at p. 494, italics omitted.)

In reaching its conclusion, the *Parkmerced* court faulted the trial court for "ignor[ing] the fact that the ordinance protects those who legally occupy a rental unit, regardless of the basis of the person's obligation to pay rent." (*Parkmerced*, *supra*, 215 Cal.App.3d at p. 494.) The *Parkmerced* court also disagreed with the lower court's summary conclusion that Abenheim had no obligation to pay rent until she signed her own rental agreement in 1985. (*Id.* at p. 495.) Citing authority recognizing that an obligation to pay rent can arise by operation of law based on occupancy accompanied by the owner's consent, the *Parkmerced* court rejected the notion that without a written lease, Abenheim could not have had an obligation to pay rent. (*Ibid.*) Finally, the *Parkmerced* court found that "interpreting the Rent Ordinance to extend protection to tenants based on legitimate occupancy is in keeping with the purpose of the legislation." (*Ibid.*) The court reasoned that a "clear objective" of the Rent Ordinance was to extend " 'some measure of protection to tenants in residence' [citation]" and that there was "absolutely no indication that this protection was intended to be limited to those tenants who sign formal lease agreements." (*Ibid.*. italics omitted.)

As defendants contend, *Parkmerced*, *supra*, 215 Cal.App.3d 490, demonstrates that an occupant of a San Francisco rental unit can qualify as a tenant without having a

---

[12] In the version of the Rent Ordinance that was in effect when the *Parkmerced* rent increase was litigated, the definition of a tenant was contained in section 37.2, subdivision (r) of the Rent Ordinance. (Ord. 438-83, File No. 109863 (Aug. 29, 1983), p. 5.) As noted previously, the definition itself was the same as it is today.

written lease agreement. Indeed, that fact is reflected in section 37.2(t), which states that a tenant can obtain the right to exclusive possession via a written agreement, oral agreement, sub tenancy approved by the landlord or suffrage. (Rent Ordinance, § 37.2(t).) However, *Parkmerced* does not support defendants' very different contention that David is a tenant notwithstanding the fact that he is a minor. In *Parkmerced*, the original tenant's sister was an adult. Therefore, the case did not consider the question we address here. Furthermore, the *Parkmerced* court found that Abenheim became a tenant in her own right because she was named in lease "applications" that were incorporated into the written leases, and because she incurred an independent obligation to pay rent by operation of law based on her occupancy accompanied by the landlord's consent. (*Parkmerced*, at pp. 494-495.) Those findings cannot be made with respect to David because he is a minor with no independent obligation to pay rent.

Aside from *Parkmerced*, defendants contend that a "long and uncontroverted line of appellate authority" establishes that the Rent Ordinance definition of a tenant "includes all lawful occupants of the dwelling." But the cases they cite do not support this claim. For example, defendants rely on *Aguierre v. Lee* (1993) 20 Cal.App.4th 1646, 1653 (*Aguierre*), for the proposition that "[t]he Ordinance focuses on occupancy as the factor that triggers rent control protection. [Citation.]" In that case, a San Francisco tenant was displaced temporarily from her leased residential unit due to earthquake damage. After making the necessary repairs, the landlord leased the unit to a third party in violation of the rights of the tenant. In the landlord's appeal from a jury verdict in favor of the tenant, the *Aguierre* court rejected the argument that the displaced tenant was not protected by the Rent Ordinance because the ordinance only protects tenants in occupancy. Nothing the court said supports defendants' contention in this case that all lawful occupants of a rental unit are by definition tenants under section 37.2(t) of the Rent Ordinance.

Defendants contend *Cobb v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2002) 98 Cal.App.4th 345 (*Cobb*), illustrates that the Rent Ordinance definition of a tenant includes "occupancies created by consent and acceptance of rent." It is not clear why defendants believe this proposition is relevant, particularly in light of

18

the fact that section 37.2(t) states that a tenant can acquire the right to exclusive position by means of an oral agreement. Furthermore, *Cobb* is factually and legally inapposite. In that case, Richard Passalacqua was an adult when he went to live with his mother in a San Francisco apartment she rented. The landlord did not give his permission but knew that Passalacqua was living in the unit. Almost two years later, in May 1998, Passalacqua's mother moved out of the apartment and the landlord accepted rent directly from Passalacqua for more than a year, and during that period he even negotiated a rent increase directly with Passalacqua. The *Cobb* court found these facts substantially supported a finding by the Rent Board that the landlord accepted Passalacqua as his sole tenant as of June 1998. (*Cobb*, at p. 352.) Defendants fail to explain how *Cobb* supports their contention that all lawful occupants of a rental unit qualify as tenants under section 37.2(t). Indeed, they do not identify any authority supportive of this broad claim.[13]

## 2. *A Minor's Occupancy Pursuant to a Written Lease*

Insisting that a "tenant's child may be a tenant protected under the Rent Ordinance," defendants direct our attention to *Mosser Companies v. San Francisco Rent Stabilization & Arbitration Bd.* (2015) 233 Cal.App.4th 505 (*Mosser Companies*) and *T & A Drolapas & Sons, LP v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2015) 238 Cal.App.4th 646 (*Drolapas*).

*Mosser Companies*, *supra*, 233 Cal.App.4th 505, was a dispute regarding a rent increase at a San Francisco apartment. In 2003, the Govender family moved into the apartment pursuant to a written lease agreement. Although Mr. and Mrs. Govender were the only "tenants" identified in the lease, it was undisputed that the landlord approved the

---

[13] The two other cases defendants cite addressed different rent control ordinances. (*Getz v. City of West Hollywood* (1991) 233 Cal.App.3d 625 (*Getz*); *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28 (*DeZerega*). Furthermore, the issue in *Getz*, at page 629, was not whether a lawful occupant was a tenant, but whether a tenancy was created despite the absence of a written agreement based on evidence of the landlord's consent and acceptance of rent. *DeZerega*, *supra*, 83 Cal.App.4th 28 is also irrelevant as the issue in that case was whether the roommate of a tenant who signed the lease was a tenant or a subtenant.

19

occupancy of the three Govender children who were all minors at the time the lease was signed. (*Id*. at p. 509.) Nine years later, the Govender parents decided to move. By that time, two of the children had left home, but 23-year-old Brian continued living in the apartment.

After the Govender parents moved out, the landlord served notice that it was raising Brian's rent, which triggered a dispute about whether the increase was authorized by Civil Code, section 1954.53, subdivision (d)(2) (Civil Code section 1954.53(d)(2)), a vacancy decontrol provision of the Costa-Hawkins Rental Housing Act (Civ. Code, §§ 1950 et seq.; Costa-Hawkins Act), which provides: "If the original occupant or occupants who took possession of the dwelling or unit pursuant to the rental agreement with the owner no longer permanently reside there, an owner may increase the rent by any amount allowed by this section to a lawful sublessee or assignee who did not reside at the dwelling or unit prior to January 1, 1996."

The Govenders objected that the rent increase was unlawful because, even though the parents were no longer living in the apartment, Brian "was an original occupant entitled to continued rent control." (*Mosser Companies*, *supra*, 233 Cal.App.4th at p. 509.) However, the landlord claimed that the statutory phrase "took possession" in Civil Code section 1954.53(d)(2) was a term of art, which required that the person claiming original occupancy had to have acquired a legal right of possession by being a party to the lease agreement. Without this qualification, the landlord argued, a minor could "inherit" his parent's tenancy and thereby acquire "rights without obligations." (*Id.* at p. 515.)

Affirming a judgment precluding the landlord from increasing Brian's rent, the *Mosser Companies* court concluded that "[t]he plain meaning of an 'original occupant . . . who took possession of the dwelling or unit pursuant to the rental agreement' (§ 1954.53, subd. (d)(2)) is an individual who has resided in the dwelling from the start of the tenancy with the landlord's permission." (233 Cal.App.4th at p. 512.) In reaching this conclusion, the court rejected the landlord's objection that Brian should not be allowed to " 'inherit' his parent's tenancy," finding that Brian had "his own personal right of

occupancy," and that "Brian's rights ha[d] concomitant obligations." (*Id*. at p. 516.) As the court explained, "[w]hen Brian's parents vacated the apartment and Brian, as an adult, chose to remain in occupancy, he became a tenant obligated to pay rent. Tenancies in property need not be created by written leases. [Citation.] One may become a tenant by occupancy with consent. [Citation.] ' "Such tenancies carry with them the relationship of landlord and tenant. The tenant is liable by operation of law." [Citations.]' [Citation.]" (*Ibid*.)

*Drolapas*, *supra*, 238 Cal.App.4th 646, was another case addressing whether a rent increase was authorized by Civil Code section 1954.53(d)(2) of the Costa-Hawkins Act. In 1995, Mr. and Mrs. Lara executed a written rental agreement and moved into the apartment with their children, including six-year-old Borjas. In 2000, appellant purchased the apartment building and the Lara parents signed a statement identifying themselves as the tenants, but also stating that the unit was occupied by two adults and four children, which was the number of "allowable tenants." (*Id*. at p. 649.) In 2010, the Lara parents bought a home they began to use as their primary residence, but they continued to pay rent on the apartment. Meanwhile, Borjas continuously lived in the apartment and paid rent to his parents when he was able. (*Ibid*.)

Applying *Mosser Companies*, this court first concluded that "Borjas was an 'original occupant' within the meaning of section 1954.53, subdivision (d)(2)" when he moved into the apartment as a six-year-old child. (*Drolapas*, *supra*, 238 Cal.App.4th at pp. 652-653.) Second, we concluded that Borjas "took possession" of the apartment pursuant to the rental agreement even though he was a minor at the time. As support for this conclusion, we relied on the following reasoning in *Mosser Companies*: " ' "Possession" is a commonly understood term normally referring to physical possession. . . . [L]imiting the term to parties to a legal agreement is inconsistent both with this common understanding and with the terms used in the statute. The statute refers to an "occupant" rather than a "tenant," "lessee," or "party." These terms have distinct and well-established meanings, making it unlikely the Legislature used the term "occupant" when it meant party to a rental agreement. That the Legislature's use of the

21

term "occupant" was deliberate and intended to signify something distinct from a party to the lease is confirmed when the statute is read as a whole.' [Citation.]" (*Drolapas*, *supra*, 238 Cal.App.4th at p. 653, quoting *Mosser Companies*, *supra*, 233 Cal.App.4th at p. 513.)

Defendants mistakenly rely on *Mosser Companies* and *Drolapas*. The primary issue in both of these cases was how to interpret statutory language in the Costa-Hawkins Act, specifically, the words "occupant" and "possession" in Civil Code section 1954.53(d)(2). (*Mosser Companies*, *supra*, 233 Cal.App.4th at pp. 512-513; *Drolapas*, *supra*, 238 Cal.App.4th at pp. 652-653.) The present case does not involve a proposed rent increase under the Costa-Hawkins Act.[14] Beyond that, the question we address is not whether David is an occupant or in possession of Unit 308A. The issue here is whether David's status as a minor precludes him from being a "tenant" for all purposes under section 37.2(t) of the Rent Ordinance. *Mosser Companies* and *Drolapas* do not address this discrete issue. To be sure, the occupants in possession of the rental units in those case were tenants within the meaning of section 37.2(t) when their respective landlords attempted to increase their rent, but by that time both were adults. Indeed, as the *Mosser Companies* court explicitly stated, after Brian's parents "vacated the apartment and Brian as an adult, chose to remain in occupancy, he became a tenant obligated to pay rent." (233 Cal.App.4th at p. 516.)

To summarize our conclusions, the general definition of a tenant set forth in section 37.2(t) of the Rent Ordinance does not embrace a minor child who legally occupies a rental unit. Rent Ordinance, section 37.9A(e)(3)(A) requires the landlord to make a relocation payment to "each tenant," but this part of the Ordinance does not include a special definition of a tenant that broadens or alters the scope of section 37.2(t), or any other provision directing a landlord to pay a separate relocation benefit to the child of a tenant. Taken together, these facts compel us to reverse the judgment in this case.

---

[14] *Cobb*, *supra*, 98 Cal.App.4th 345, which we have already discussed, also involved an issue under the Costa-Hawkins Act that does not impact our conclusions here.

22

We emphasize that the question before us is not whether the San Francisco Board of Supervisors has the authority under the Ellis Act to confer a section 37.9A(e) relocation benefit on a child. Rather, we hold only that a minor is not a tenant entitled to a separate relocation payment under Rent Ordinance, section 37.9A(e), as currently written.

## V. DISPOSITION

The July 15, 2016 order by the appellate panel is reversed and this case is remanded for further proceedings consistent with this decision.

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
RIVERA, J.


A149062, *Danger Panda LLC v. Launiu*

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Ronald E. Quidachay |
| Counsel for Appellant: | Law Office of Paul J. Katz and Paul J. Katz |
| | Zacks & Freedman, Andrew Zacks |
| Counsel for Amicus Curiae San Francisco Apartment Association on behalf of Appellant: | Dowling & Marquez, Curtis F. Dowling |
| Counsel for Respondents: | Tenderloin Housing Clinic, Inc., Stephen L. Collier, Raquel Fox |

A149062, *Danger Panda LLC v. Launiu*